UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CITY OF CHELSEA, CITY OF LAWRENCE,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, JOHN F. KELLY, Secretary of United States Department of Homeland Security, DANA J. BOENTE, Acting Attorney General of the United States, DOES 1-100,<br>Defendants. | Civil Action No.   17-10214 |

## **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

### **INTRODUCTION**

1.      On January 25, 2017, Defendant President Donald J. Trump signed Executive Order No. 13,768 entitled "Enhancing Public Safety in the Interior of the United States."  Executive Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ("Executive Order").  The Executive Order is a major affront to basic principles of federalism and the separation of powers.  The Executive Order seeks, without congressional authorization, to commandeer local officials to enforce the federal government's immigration policies, and threatens municipalities with crippling losses of funding, apparently including funding for programs with no connection to law enforcement, if the municipalities do not come to heel.  Particularly for smaller and more impoverished cities and towns, the impact of this Executive Order is both immediate and chilling.

2.      The Executive Order announces that it is the federal executive branch's policy to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal

funds, except as mandated by law."  Executive Order Sec. 2(c).  Section 9(a) of the Executive

Order directs the U.S. Attorney General and the Secretary of the Department of Homeland

Security ("DHS") to "ensure" that certain "sanctuary jurisdictions," which are defined as

"jurisdictions that willfully refuse to comply with 8 U.S.C. [§] 1373," are "not eligible to receive

Federal grants," and further orders "enforcement action" against any entity that "violates 8

U.S.C. [§] 1373" or "has in effect a statute, policy, or practice that prevents or hinders the

enforcement of Federal law."  Executive Order Sec. 9(a).

3.      The City of Chelsea ("Chelsea") and the City of Lawrence ("Lawrence")

(collectively, "Plaintiff Cities" or "Cities") seek declaratory and injunctive relief against the

United States of America and the above-named federal officers and Defendants for violating the

Tenth and Fifth Amendments of the U.S. Constitution and principles of federalism and

separation of powers.  Plaintiff Cities further seek a declaration, under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202 *et seq*., that they comply with 8 U.S.C. § 1373.

4.      Plaintiff Cities face a significant risk of sanctions from Defendants if Defendants

implement the Executive Order, which seeks to exact severe measures against so-called

"sanctuary jurisdictions."

5.      Chelsea self-identifies as a "sanctuary city" and Lawrence, a "Trust Act City," is

widely labeled as such.  The label "sanctuary city" is distinct from the term "sanctuary

jurisdiction" under the Executive Order.  Plaintiff Cities use the term "sanctuary city" or "Trust

Act City" to refer to their policies of deprioritizing local law enforcement participation in federal

civil immigration investigations and detentions, in an effort to promote public safety and

confidence in local law enforcement.  Plaintiff Cities are not "sanctuary jurisdictions" as that

term is used in the Executive Order.

6.      Past statements and practices of the President and Executive officers, however, suggest that Plaintiff Cities will be treated as "sanctuary jurisdictions" under the Executive Order.

7.      Furthermore, the Executive Order ambiguously directs the Attorney General to "take appropriate enforcement action against any entity . . . which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law."  Executive Order Sec. 9(a). This presents an immediate threat to Plaintiff Cities, which are now presented with a Hobson's choice: either repeal policies that they have determined to be necessary to the safety and well-being of local residents, or submit to the mercy of the Attorney General's determination as to whether they have in effect policies or practices that "hinder" the enforcement of federal law.

8.      Plaintiff Cities rely on federal funding to fill critical budgetary needs and, particularly as relatively small jurisdictions, cannot afford uncertainty over whether they will lose federal funds or be subjected to undefined "appropriate enforcement action" by the Attorney General if they are found to have policies or practices that "hinder" federal law enforcement.

9.      If Plaintiff Cities are found to be "sanctuary jurisdictions," the Executive Order instructs the Attorney General and the Secretary of DHS to "ensure" that Plaintiff Cities are "not eligible to receive Federal grants."  Executive Order Sec. 9(a).  The threat to rescind federal grants in order to coerce Plaintiff Cities to enforce federal immigration law constitutes unconstitutional coercion for three reasons.

a.      First, Plaintiff Cities did not have any notice, much less the unambiguous notice required by law, that accepting federal grants would require them to actively enforce federal immigration orders.  In enacting § 1373, Congress included no reference to any consequences to federal funding.  In fact, § 1373

includes no language regarding federal grants or funding.  The Executive Order attempts to retroactively impose conditions on the receipt of almost all federal funding, making it impossible for affected cities to make informed decisions about whether to participate in federal grant programs.

b.      Second, the Executive Order conditions the receipt of federal grants by municipalities on their cooperation with Executive interpretations of immigration enforcement, without any limitation as to which federal funds or grants are at stake.  The only stated exception for grants which may be denied to municipalities deemed "sanctuary jurisdictions" is for those grants "deemed necessary for law enforcement purposes by the Attorney General or the Secretary."  Executive Order Sec. 9(a).  Therefore, potentially all federal grants or pass-through grants to Plaintiff Cities are threatened.  The amount of federal grants at stake amount to a "gun to the head" of the Cities.

c.      Third, there is no nexus between the immigration issues addressed by the Executive Order and the funds threatened to be withheld from "sanctuary jurisdictions."  The Executive Order conditions receipt of federal grants on the execution and enforcement of immigration laws, a condition that is unrelated to the federal interests at stake in most federal grants, and the Executive Order in no way attempts to connect immigration to the purpose for which the threatened funds are expended.

10.   Applying the Executive Order against Plaintiff Cities would also violate the Tenth Amendment's anti-commandeering principle.  If § 1373 prohibits Plaintiff Cities' ordinances and

policies, then it should be struck down as an unconstitutional restriction on lawful exercises of state sovereignty, in violation of the Tenth Amendment of the U.S. Constitution.

11.    Plaintiff Cities derive their legislative and executive authority from the Commonwealth of Massachusetts.  Under the Home Rule Amendment, Article 89 of the Massachusetts Constitution, the people of the Commonwealth of Massachusetts exercise the right of self-government as residents of their cities and towns, as they do as residents of Massachusetts.  As local governments elected through the "traditional liberties of the people with respect to the conduct of their local government," Mass. Const. amend. art. LXXXIX, Plaintiff Cities exercise the authority to regulate local law enforcement agencies, including by adopting law enforcement priorities and practices that aim to promote public safety and welfare in the Cities.  If § 1373 is interpreted to unlawfully restrict this basic exercise of state sovereignty, then it is unconstitutional.

12.    Section 1373 is further unconstitutional on its face, as it purports to restrict how state and local governments can regulate their officers and employees.

13.    The Executive Order itself also violates the Tenth Amendment and fundamental principles of federalism, as it purports to grant the Attorney General blanket authority to "take appropriate enforcement action" to force state and local governments to conform local policies and practices to the dictates of the federal government, thus subjugating the policymaking authority of state and local government, and the voices of their electorates, to the regulation of the federal government.  Executive Order Sec. 9(a).

14.    The Executive Order violates the separation of powers by creating a penalty for § 1373 that Congress did not authorize, without regard to statutory rules on grant programs put in place by Congress. The Executive Order effectively legislates a sanction for violations of § 1373

by using the statute as a basis to broadly deny federal grants to municipalities that have made a policy decision to focus law enforcement resources on local problems and limit their entanglement with federal immigration enforcement.  The President's unilateral imposition of this new sanction and condition on spending is not supported by any act of Congress, including the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*., or by the Constitution.

15.    The Executive Order is unconstitutionally vague because cities cannot reasonably determine whether they fit into its definition of "sanctuary jurisdictions," whether they are subject to its penalties, or what penalties those might be.  As worded, the Executive Order threatens to rescind federal grants to Plaintiff Cities in such broad terms that it would cripple the Cities—and other similarly situated cities—if they are found subject to the penalties imposed on "sanctuary jurisdictions."  The Executive Order also gives discretion to the Secretary of DHS to "designate" a "sanctuary jurisdiction," but no standards are given for how that designation may be determined.

16.    Plaintiff Cities depend on federal grants both to provide necessary daily functions, like the operation of public schools, and to provide critical emergency services, such as fire departments.  Therefore, an immediate resolution on the parties' respective legal rights is necessary.  Plaintiff Cities' vulnerability and uncertainty under the Executive Order paralyzes their ability to budget daily governance needs and implement their law enforcement policies and priorities.

17.    Plaintiff Cities accordingly seek a declaration that Executive Order Section 9(a) is unlawful, and an injunction barring Defendants from implementing it.

## JURISDICTION AND VENUE

18.    The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*  The United States has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

19.    Venue properly lies within the District of Massachusetts because Plaintiffs, the City of Chelsea and the City of Lawrence, reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District.  28 U.S.C. § 1391(e).

## PARTIES

20.    Plaintiff City of Chelsea is a municipal corporation organized and existing under and by virtue of the laws of the Commonwealth of Massachusetts, and is a charter city.

21.    Plaintiff City of Lawrence is a municipal corporation organized and existing under and by virtue of the laws of the Commonwealth of Massachusetts, and is a charter city.

22.    Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

23.    Defendant United States of America is sued under 28 U.S.C. §§ 1331 and 1346.

24.    Defendant John F. Kelly is the Secretary of the U.S. Department of Homeland Security.  The DHS is a cabinet department of the U.S. federal government with the primary mission of protecting the homeland security of the United States.  Secretary Kelly is responsible for executing relevant provisions of the Executive Order.  Secretary Kelly is sued in his official capacity.

25.    Defendant Dana J. Boente is the Acting Attorney General of the United States.  The Attorney General is a cabinet position of the U.S. federal government overseeing the U.S. Department of Justice.  Acting Attorney General Boente is responsible for executing relevant

provisions of the Executive Order.  Acting Attorney General Boente is sued in his official capacity.

26.    Doe 1 through Doe 100 are sued under fictitious names.   Plaintiffs do not now know the true names or capacities of said Defendants, who may or will be responsible for the violations alleged, but pray that the same may be alleged in this Complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.    THE PLAINTIFFS

#### A.  The City of Chelsea

27.    The City of Chelsea, Massachusetts is located directly across the Mystic River from Boston.  It was first settled in 1624, established itself as a town in 1739 and was incorporated as a city in 1857.  With a land area of just 1.8 square miles, it is the smallest city in Massachusetts and, as of 2015, had an estimated population of approximately 39,398.

28.    Chelsea is a diverse, working-class community that has twice been given the All-America City Award by the National Civic League, in recognition of the ability of its residents to work together to identify and tackle community-wide challenges.  Approximately 62.1% of the city's residents identify as Hispanic or Latino.  As of 2010, 44% of the city's residents were born outside of the United States, the highest percentage in Massachusetts.

29.    The per capita income in Chelsea is $21,722.  Approximately 20.9% of Chelsea's residents live below the poverty line.

30.    Chelsea has an annual budget of $170 million, of which approximately $13.9 million derives from federal funding.  As of 2015, Chelsea employed approximately 1,287 people.

### B.  The City of Lawrence

31.    The City of Lawrence, Massachusetts was built in the 1840s as the nation's first planned industrial center, and 35% of its economy is still manufacturing-based.  Located 25 miles north of Boston, it had an estimated population of approximately 80,231,  as of 2015.

32.    Lawrence has long been a multi-ethnic and multicultural gateway city.  The successive waves of immigrants coming to Lawrence to work in the mills began with the Irish, followed by other European immigrants and later immigrants from Puerto Rico, the Dominican Republic, Vietnam, and Cambodia.  Today, the U.S. Census Bureau estimates that 37.4% of Lawrence's residents were born outside the United States.  As of 2010, 73.8% of the city's residents identified as Hispanic or Latino.

33.    The per capita income in Lawrence is $17,167.  Approximately 28.4% of Lawrence's residents live below the poverty line.

34.    Lawrence has an annual budget of $245 million, of which approximately $37.8 million derives from federal funding.  Lawrence employs approximately 2,967 people.

## II.    DEFENDANTS' ACTIONS

### A.  Defendants' Statements Regarding Sanctuary Cities

35.    Targeting sanctuary cities is one of President Trump's policy priorities.  In a recent interview with Bill O'Reilly, President Trump said he is "very much opposed to sanctuary cities," that sanctuary cities "breed crime," and that defunding sanctuary cities is "a weapon" he might use.  Dan Brekke, *Trump: California 'Out of Control' and Defunding Could Be in Store* (Feb. 6, 2017), KQED News, https://ww2.kqed.org/news/2017/02/06/trump-california-out-of-control-and-defunding-could-be-in-store/.

36.    In a statement by White House Press Secretary Sean Spicer on January 25, 2017, announcing the issuance of the Executive Order, Spicer stated: "We are going to strip federal

grant money from the sanctuary states and cities that harbor illegal immigrants. The American

people are no longer going to have to be forced to subsidize this disregard for our laws." White

House, 1/25/17: White House Press Briefing, YouTube (Jan. 25, 2017), *available at*

https://www.youtube.com/watch?v=OaPriMVvtZA.

37.    These recent statements about sanctuary cities by the Trump administration are

consistent with the stated policy priorities of the Trump campaign.  During the campaign, then-

candidate Trump and his associates used similarly inflammatory and divisive rhetoric to

manufacture fear about sanctuary cities and their residents.  These statements were made without

regard to the substance of the cities' policies and priorities.  The Executive Order is an attempt to

zealously pursue the promises of the Trump campaign.

38.    In statements to The Daily Caller on July 7, 2015, Senator Jeff Sessions—now the

Attorney General nominee –and Congressman Darrell Issa criticized sanctuary cities for failing

to honor detainers issued by U.S. Immigration and Customs Enforcement ("ICE").  An ICE

detainer is a request by a federal immigration enforcement agency to obtain information about

where an individual in the custody of state or local law enforcement is incarcerated, and may

request state or local law enforcement either to hold the person for the agency or to notify the

agency when release of the person is imminent.  Attorney General nominee Senator Jeff Sessions

stated, "This disregarding of detainers and releasing persons that ICE has put a hold on—it goes

against all traditions of law enforcement.  Laws and courtesies within departments—if you have

somebody charged with a crime in one city, you hold them until you complete your business

with them . . . .  So what was happening was, ICE authorities were filing detainers and sanctuary

cities were saying, 'We're not gonna honor them.  They finished paying for the crime they

committed in our city—we've released them.'"  Kerry Picket, *Sen. Sessions: City Officials*

*Harboring Illegal Immigrant Felons Could Be Charged With Crime*, The Daily Caller (July 7, 2015), http://dailycaller.com/2015/07/07/sen-sessions-city-officials-harboring-illegal-immigrant-felons-could-be-charged-with-crime/.

39.     In an interview with Breitbart News in May 2016, then-presidential candidate Trump stated, "Sanctuary cities are a disaster . . . .  They're a safe-haven for criminals and people that should not have a safe-haven in many cases.  It's just unacceptable.  We'll be looking at sanctuary cities very hard."   Matthew Boyle, *Exclusive —Donald J. Trump to San Francisco: Sanctuary Cities 'Unacceptable,' A 'Disaster' Creating 'Safe-Haven for Criminals'*, Breitbart News (May 16, 2016), *available at* http://www.breitbart.com/2016-presidential-race/2016/05/16/exclusive-donald-jtrump-to-san-francisco-sanctuary-cities-unacceptable-a-disaster-creating-safehaven-for-criminals/.

40.     Another Breitbart News article published on November 21, 2016 regarding sanctuary cities quoted Texas Congressman John Culberson as stating: "The law requires cooperation with immigration officials 100 percent of the time."  Bob Price, *Sanctuary Cities Risk Losing DOJ Funds In 2017, Texas Congressman Says*, Breitbart News (Nov. 21, 2016), http://www.breitbart.com/texas/2016/11/21/sanctuary-cities-risk-losing-doj-funds-2017-texas-congressman-says/.

**B.   The Executive Order**

41.     The Executive Order defines "sanctuary jurisdictions" as jurisdictions that "willfully violate Federal law in an attempt to shield aliens from removal from the United States."  Executive Order Sec. 1.

42.     The Executive Order also defines "sanctuary jurisdictions" as jurisdictions that "willfully refuse to comply with 8 U.S.C. [§] 1373."  *Id.* Sec. 9(a).

43.    The Executive Order also gives the Secretary of DHS the "authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction." *Id.*

44.    The Executive Order also defines "sanctuary jurisdiction" as "any entity that violates 8 U.S.C. [§] 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.*

45.    The Executive Order demands that "sanctuary jurisdictions" that fail to comply with "applicable Federal law" do not receive Federal funds, "except as mandated by law." *Id.* Sec. 2(c).

46.    The Executive Order also gives the Attorney General and the Secretary of DHS the discretion to ensure that "sanctuary jurisdictions" "are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." *Id.* Sec. 9(a).

47.    The Executive Order further directs that the Attorney General "shall take appropriate enforcement action against any entity that violates 8 U.S.C. [§] 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.* Sec. 9(a).

III.    **PLAINTIFFS ARE NOT "SANCTUARY JURISDICTIONS" AS SET FORTH IN THE EXECUTIVE ORDER**

48.    Plaintiff Cities, as empowered by the Massachusetts Constitution, have the right of self-government regarding local matters.  Mass. Const. amend. art. LXXXIX.  To that end, they have enacted ordinances to further local law enforcement priorities.  Plaintiff Cities, in order to protect all of their residents, have approved ordinances that recognize it is not in their interest or in the interests of their residents to become entangled in federal immigration enforcement.

49.    These ordinances, and subsequent policies, have been enacted to promote effective law enforcement in the Cities, as studies have shown that victims and witnesses of crimes are much less likely to come forward if they fear deportation.  *See, e.g.*, Bill O. Hing, *Immigration Sanctuary Policies: Constitutional and Representative of Good Policing and Good Public Policy*, 2 U.C. Irvine L. Rev. 247, 249-50, 303-08 (2012).  Encouraging public confidence in local law enforcement promotes the safety of all residents in Plaintiff Cities, and dispels any paralyzing sense of false immunity that undocumented immigrants may impute to residents who enjoy the protections of U.S. citizenship.

50.    Crime is statistically significantly lower in sanctuary counties compared to non-sanctuary counties.  Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center for American Progress (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.

**A.  Chelsea**

51.    Chelsea declared itself a sanctuary city in a June 4, 2007 Resolution, in order to further its efforts to "promote a community as a safe haven for refugees and immigrants who are currently residing in that community from other countries."  Resolution of the City of Chelsea, Massachusetts, Chelsea City Council (June 4, 2007), *available at* http://www.bostonmayday.org/chelsea_resolution.html ("June 4, 2007 Resolution").

52.    Chelsea's Police Chief and its City Manager routinely speak at public gatherings regarding Chelsea's commitment to the safety of all of its residents, regardless of documentation status.  *See, e.g.*, Al-Huda Society, *Chelsea City Manager Supports Local Muslim Community*, YOUTUBE (Nov. 18, 2016), https://www.youtube.com/watch?v=BALyWNTgo_Q; City of

Chelsea Multi-Media, *Tom Ambrosino MLK Day Speech*, YOUTUBE (Jan. 18, 2017),

https://www.youtube.com/watch?v=dZ7Qt0zXzPY.

53.    The Chelsea Police Department promulgated "The Specific Role and Impact on the

CPD in the Enforcement of Federal Immigration Law By the Department of Homeland Security

(DHS-ICE) with the 2015 Priority Enforcement Program effective January 5, 2015."  General

Order 2015-01, Chelsea Police Department (Jan. 5, 2015), *available at*

http://chelseapolice.com/wp-content/uploads/sites/31/2016/01/1.33-Role-and-Impact-of-Federal-

PEP-Program-on-CPD-1.pdf ("Chelsea Police Policy")  The Chelsea Police Policy states that

"[t]he City and the Chelsea Police Department are committed to promoting safety and providing

proactive community policing services to all who are located in our community."  Chelsea Police

Policy at 1.

54.    To further local law enforcement objectives, the Chelsea Police Department

encourages all members of the community, regardless of documentation status, to seek assistance

from the Chelsea Police Department.  The Chelsea Police Policy also recognizes that "[t]his type

of mutual trust and spirit of cooperation is absolutely crucial in preventing and solving crime

incidents, as well as maintaining public order, safety and security in the entire community."  *Id.*

at 1-2.

55.    Chelsea's Police Policy provides a detailed outline of how Chelsea complies with

the DHS Priority Enforcement Program ("PEP").  Chelsea Police Policy at 2-5.  This includes a

commitment to community education regarding the contours of Chelsea's compliance with PEP

and how such compliance does not inhibit local law enforcement goals.  *Id.* at 5.

56.    The Chelsea Police Policy states that the Chelsea Police Department "shall not

undertake immigration-related investigations and shall not routinely inquire into the specific

immigration status of any person(s) encountered during normal police operations." *Id.* at 5. This policy does not prohibit the Chelsea Police Department from cooperating and assisting with federal immigration officials during criminal investigations or when there is a serious threat to public safety or national security. *Id.* at 6.

57.   Procedurally, under the Chelsea Police Policy officers "*shall not* question any person about his or her specific citizenship or immigration status *unless* that person is reasonably believed to be involved in" certain types of enumerated conduct including felonious activity, terrorism, and human trafficking. *Id.* at 6-7 (emphasis in original). Furthermore, the Chelsea Police Department shall not participate in ICE tactical operations to enforce purely civil immigration violations. *Id*. at 8.

58.   The Chelsea Police Department fingerprints everyone whom they arrest. Those fingerprints are electronically submitted to the Federal Bureau of Investigation, which shares that information with DHS. Additionally, Chelsea has complied with every ICE Detainer Request it has received.

59.   Chelsea is not a "sanctuary jurisdiction" within the meaning of the Executive Order because Chelsea is not in willful violation of 8 U.S.C. § 1373. As stated in the June 4, 2007 Resolution and the Chelsea Police Policy, the purpose of Chelsea's actions are to promote public safety, not to willfully violate federal immigration law. Indeed, the Chelsea Police Policy explicitly outlines Chelsea's commitment to cooperation with PEP and criminal immigration efforts, in accordance with § 1373.

### B.  Lawrence

60.   Lawrence is a Trust Act Community, and is regularly labeled as a "sanctuary city" by various media outlets. *See, e.g.*, Center for Immigration Studies, *Map: Sanctuary Cities, Counties, and States* (January 2016), http://cis.org/Sanctuary-Cities-Map; Maria Sacchetti,

*Sanctuary cities say Trump's plan will hurt residents most in need*, Boston Globe (Nov. 30,

2016), *available at* https://www.bostonglobe.com/metro/2016/11/30/sanctuary-cities-say-trump-

plan-will-hurt-neediest-residents/NuZ8WoDCaEyj1bKsnsr9OL/story.html; Caroline May,

*Massachusetts city moves to enact sanctuary policies*, Breitbart (Aug.13, 2015),

http://www.breitbart.com/big-government/2015/08/13/massachusetts-city-moves-to-enact-

sanctuary-policies/.

     61.   On August 11, 2015, the Lawrence City Council adopted the Lawrence Trust

Ordinance, "to increase public confidence in Lawrence Law Enforcement by providing

guidelines associated with federal immigration enforcement, arrests, and detentions."  Lawrence

Trust Ordinance, § 9.20.010 *et seq*.  The Lawrence Trust Ordinance seeks to promote public

confidence in city law enforcement agencies by assuring all residents that their citizenship or

immigration status will "have no bearing on an individual's treatment" by city law enforcement

personnel.  Lawrence Trust Ordinance, § 9.20.020.

     62.   During the August 11, 2015 City Council meeting, where the City Council

approved the Lawrence Trust Ordinance, many spoke about how undocumented immigrant

victims of crime, including those in domestic violence situations, were afraid to seek help out of

fear the police would investigate their status.  Keith Eddings, *'Sanctuary City' policy OK'd*,

Eagle Tribune (Aug. 12, 2015), *available at* http://www.eagletribune.com/news/

new_hampshire/sanctuary-city-policy-ok-d/article_f59e88dd-7efe-59ab-be25-

93161f22773e.html ("Eagle Tribune Article").

     63.   In order to achieve its local law enforcement goals, the Lawrence Trust Ordinance

generally declares the enforcement of federal immigration law as beyond the purview of the

City, and prohibits the City's law enforcement personnel from contacting, detaining, or arresting a person based on immigration status.  Lawrence Trust Ordinance, § 9.20.020.

64.    Specifically, § 9.20.040(a) prohibits City law enforcement personnel from arresting, detaining, or extending the detention of an individual solely on the basis of requests or civil custody warrants issued by ICE, the enforcement arm of DHS, or other federal immigration administrative officers.

65.    Section 9.20.040(b) also prohibits Lawrence law enforcement personnel from responding to "any ICE notification request seeking information about an individual's incarceration status," or other personal information about an individual.  The notification request, as used in this section, is not a Request for Notification (I-247N), which is defined in § 9.20.030 as an "Immigration Hold."

66.    Section 9.20.040(c) also prohibits City law enforcement personnel from allowing ICE agents "access to or use of facilities, records/databases, booking lists, or individuals in custody either in person or via telephone or videoconference."

67.    Importantly, Section 9.20.040 allows Lawrence officers and employees to comply with ICE requests in cases where ICE "demonstrates a criminal warrant signed by a judge and based on probable cause."  The Lawrence Trust Ordinance contemplates that there may be cases when Lawrence law enforcement acquiesces to an ICE request, in which case it provides that any individual subject to ICE intervention "shall be provided with a copy of the ICE request and any other documentation pertaining to their case that is presented to the law enforcement agency." Lawrence Trust Ordinance, § 9.20.040(d).

68.    Lawrence is not a "sanctuary jurisdiction," as defined in the Executive Order, because it is not in willful violation of 8 U.S.C. § 1373.  As stated in the Lawrence Trust

Ordinance, the purpose of Lawrence's ordinance is to promote public safety, not to willfully

violate federal immigration law.  In fact, the Lawrence Trust Ordinance explicitly outlines

procedures for compliance with federal immigration efforts, in accordance with 8 U.S.C. § 1373.

## IV.   DEFENDANTS MIGHT TREAT PLAINTIFFS AS "SANCTUARY JURISDICTIONS"

69.    There is an actual controversy between the parties because there are significant

reasons to believe that Defendants will interpret the ordinances, policies, and practices of

Plaintiff Cities to be in willful violation of 8 U.S.C. § 1373, and therefore declare Plaintiff Cities

"sanctuary jurisdictions," as defined in the Executive Order.  President Trump and the White

House have spoken openly about targeting sanctuary cities, and the Executive Order is phrased

in a way that creates tremendous uncertainty and therefore chills the policy priorities and

activities of sanctuary cities.  If Defendants designate Plaintiff Cities as "sanctuary jurisdictions"

under the Executive Order, Plaintiff Cities could lose significant federal funding, which they rely

upon to meet critical public safety needs, as well as necessary governmental functions.

70.    Executive Branch officers have previously adopted a broad construction of 8 U.S.C.

§ 1373.  The Executive Order appears to build on that construction.

71.    On May 31, 2016, the Office of the Inspector General ("OIG") issued a

memorandum reporting on its investigation into jurisdictions receiving funds from the Office of

Justice Programs and the Office of Violence Against Women.  Memorandum from M. Horowitz,

Inspector General, to K. Mason, Assistant Atty. Gen., (May 31, 2016), *available at*

https://oig.justice.gov/reports/2016/1607.pdf (the "OIG Memorandum" or "OIG Memo").

72.    The OIG Memorandum asserts that even when local laws and policies do not

expressly prohibit entities or officials from disclosing information to ICE, they may nonetheless

result in de facto "restrictions" on providing such information, which would violate § 1373.  OIG Memo at 4-7.

73.    The OIG Memorandum notes that certain jurisdictions "go beyond regulating responses to ICE detainers and also address, in some way, the sharing of information with federal immigration authorities," and states that such ordinances are "inconsistent with the plain language of § 1373 prohibiting a local government from restricting a local official from sending immigration status information to ICE."  OIG Memo at 5.

74.    The OIG Memorandum also suggests that even when local laws and policies on their face apply only to ICE detainer requests, they "may have a broader practical impact on the level of cooperation afforded to ICE . . . and may, therefore, be inconsistent with at least the intent of Section 1373." *Id.* at 7.  The OIG Memorandum goes on to suggest:  "A reasonable reading of Section 1373, based on its 'in any way restrict' language, would be that it applies not only to the situation where a local law or policy specifically prohibits or restricts an employee from providing citizenship or immigration status information to ICE, but also where the actions of local officials result in prohibitions or restrictions on employees providing such information to ICE." *Id.* at n.9.

75.    Pursuant to the OIG Memorandum and other statements made by Defendants, there is a significant likelihood that Defendants will declare that Plaintiff Cities are "sanctuary jurisdictions," under the Executive Order, thus subjecting Plaintiff Cities to a loss of funding. This uncertainty itself chills potential activities by sanctuary cities.

76.    Even if Defendants do not declare Plaintiff Cities to be "sanctuary jurisdictions" for the purposes of the Executive Order, the Defendants may deem Plaintiff Cities to be "entit[ies]" that  "ha[ve] in effect a statute, policy, or practice that prevents or hinders the enforcement of

Federal law." Executive Order Sec. 9(a). If Defendants make such a determination, the Executive Order provides that "the Attorney General shall take appropriate enforcement action against" them. *Id.*

## V.     PLAINTIFF CITIES COMPLY WITH § 1373

77.    The text of 8 U.S.C. § 1373(a) states that "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

78.    The text of 8 U.S.C. § 1373(b) states that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.  (2) Maintaining such information.  (3) Exchanging such information with any other Federal, State, or local government entity."

79.    The text of 8 U.S.C. § 1373(c) places no additional obligations or penalties on state or local governments.

80.    Plaintiff Cities comply with the requirements of 8 U.S.C. § 1373.

### A.   Chelsea Complies with 8 U.S.C. § 1373

81.    The June 4, 2007 Resolution passed by Chelsea in no way affects Chelsea's compliance with 8 U.S.C. § 1373.

82.    The Chelsea Police Policy complies with § 1373.

83.     Specifically, the Chelsea Police Policy outlines how the Chelsea Police Department shall comply with PEP and Requests for Notification, as required by 8 U.S.C. § 1373.  *See* Chelsea Police Policy at 2-5.

84.     The Chelsea Police Policy also states that it is the policy of the Chelsea Police Department not to inquire routinely about immigration status.  Under 8 U.S.C. § 1373, local governments are prohibited from passing laws that "prohibit[] or in any way restrict" the sending or receiving of information related to immigration status, but it does not place an affirmative obligation on municipalities to engage in federal immigration enforcement or to gather information regarding immigration status.  As the Chelsea Police Policy does not prohibit or in any way restrict the sending or receiving of such information, Chelsea is in compliance with § 1373.

**B.  Lawrence Complies with 8 U.S.C. § 1373**

85.     The Lawrence Trust Ordinance in no way affects Lawrence's compliance with 8 U.S.C. § 1373.

86.     Specifically, § 1373 requires only that local governments do not prohibit the sending and receiving of information regarding immigration status.  The plain language of the statute does not address any other form of information.  There is no express prohibition regarding immigration status set forth in the Lawrence Trust Ordinance.  *See* Lawrence Trust Ordinance, § 9.20.040(b).

87.     The prohibition on physical access set forth in § 9.20.040(c) in no way prohibits the sending or receiving of information addressed in § 1373.

88.     Additionally, § 9.20.040(d) of the Lawrence Trust Ordinance contemplates acquiescence to immigration holds, including Requests for Notification, in compliance with 8 U.S.C. § 1373.

89.    As the Lawrence Trust Ordinance does not prohibit or in any way restrict the sending or receiving of information related to immigration status, Lawrence is in compliance with § 1373.

## VI.    PLAINTIFF CITIES' RECEIPTS OF FEDERAL FUNDING

90.    Chelsea received, by conservative estimation, at least $13.9 million in FY 2016 from federal grants and pass-through grants from the federal government in areas including education, community development, and policing.  Chelsea is currently applying for a $1 million grant for its fire department.  Chelsea had an overall budget of approximately $170 million in FY 2016, meaning the federal funding accounted for nearly 10% of its total budget.

91.    Chelsea's fiscal year begins on July 1, 2017.  Chelsea typically begins budget discussions in February, submits a budget proposal on May 1, holds City Council debates on the budget for a month, and finalizes the budget by mid-June, just before the beginning of the fiscal year.  It is impossible to create a budget when it is unclear what effect the Executive Order will have on its funding.

92.    Lawrence received $37.8 million in Fiscal Year ("FY") 2016 from federal grants and pass-through grants from the federal government in areas including education, water pollution abatement, and child nutrition.  Lawrence had an overall budget of approximately $245 million in FY 2016, meaning the federal funding accounted for over 15% of its total budget.

93.    Lawrence's fiscal year begins on July 1, 2017.  As it typically does in other years, Lawrence will begin budget discussions in March, submit a budget proposal in May, hold City Council debate for a month, and finalize the budget by mid-June, just before the beginning of the fiscal year.  It is impossible to create a budget when it is unclear what effect the Executive Order will have on its funding.

## VII.    THE EXECUTIVE ORDER UNCONSTITUTIONALLY COERCES PLAINTIFF CITIES TO IMPLEMENT FEDERAL IMMIGRATION POLICY

94.    Plaintiff Cities received no notice that the continued offering of federal grants was contingent on their cooperation in carrying out federal immigration enforcement programs.

95.    The Executive Order conditions the receipt of federal grants on complying "with applicable Federal law."  Executive Order Sec. 2(c).

96.    The Executive Order also conditions the receipt of federal grants or funds on complying with "applicable Federal law" and complying with § 1373.  *Id.* Sec. 9(a).

97.    In enacting § 1373, Congress included no language conditioning any federal funding on cooperation by municipalities.  Consistent with the plain language of the statute, the federal government has never used § 1373 as a vehicle to impose conditions on the receipt of any federal funding, including grant programs with no connection to law enforcement.

98.    The federal grants that Lawrence and Chelsea currently receive similarly do not clearly condition funding on compliance with § 1373 or federal immigration policy.

99.     The Executive Order is ambiguous about the extent to which Plaintiff Cities must execute and enforce immigration law under § 1373, and the extent to which Plaintiff Cities must comply "with applicable Federal law."  *Id*. Sec. 2(c).  The Executive Order is also ambiguous as to whether "applicable Federal law" is limited to compliance with § 1373 or whether it refers to a broader scope of federal laws.  *Id*.

100.  The Executive Order is ambiguous about how Plaintiff Cities must fulfill the conditions for their continued receipt of federal funds, making it impossible for Plaintiff Cities to exercise their choice of whether to participate in grant programs with full knowledge of their conditions and cognizant of any consequences to their policymaking discretion.  Plaintiff Cities are unable to ascertain what is expected of them.

23

101.  The Executive Order penalizes Plaintiff Cities for not participating in its new mandate by threatening to take away their existing funding even though those funds were not clearly conditioned on compliance with § 1373.

102.  The Executive Order is ambiguous about what federal grants are threatened, only excepting from the threat funds "deemed necessary for law enforcement purposes by the Attorney General or the Secretary." *Id*. Sec. 9(a).  The Executive Order appears to strike broadly at all federal grants.  If no federal grants are deemed necessary for law enforcement purposes by the Attorney General or the Secretary, Plaintiff Cities stand to lose all grants or pass-through grants from the federal government.

103.  The Executive Order threatens Lawrence with the possibility of losing $37.8 million of federal grants and pass-through grants (as of FY 2016), except as deemed necessary for law enforcement purposes.  The Executive Order therefore threatens over 15% of Lawrence's annual budget.

104.  The Executive Order threatens Chelsea with the possibility of losing at least $13.9 million of federal grants and pass-through grants (as of FY 2016), except as deemed necessary for law enforcement purposes.  The Executive Order therefore threatens nearly 10% of Chelsea's annual budget.

105.  The threat against such large percentages of Plaintiff Cities' annual budgets is an attempt to coerce the Cities into complying with the demands of the Executive Order.

106.  There is no connection or nexus between the majority of the funds threatened by the Executive Order and the condition being imposed on Plaintiff Cities.  For example, the condition of enforcing immigration laws has nothing to do with funds marked for education, which make

up the majority of federal grants to Plaintiff Cities.  The Executive Order in no way attempts to connect immigration to the purposes for which the threatened funds were granted or expended.

## VIII.   AS APPLIED AGAINST PLAINTIFF CITIES, 8 U.S.C. § 1373 IS UNCONSTITUTIONAL

107.    As described above, *supra* ¶¶ 77-89, Plaintiff Cities are not "sanctuary jurisdictions" as that term is defined in the Executive Order, because they comply with 8 U.S.C. § 1373.

108.    Plaintiff Cities do not "prohibit" or "restrict" government entities or officials from sending or receiving immigration-status information with federal immigration agencies.  Rather, Plaintiff Cities have adopted policies and guidelines that prohibit local law enforcement personnel from being immigration-conscious in their policing activities, and thus prohibit City officers from treating individuals differently based on their citizenship or immigration status (whether known or unknown).

109.    Under these policies, local law enforcement personnel will not even be placed in a position in which they might be restricted from sending or receiving immigration-status information with federal agencies, because they are instructed not to collect or consider immigration-related information in the first place in their capacities as City officers and employees.

110.    If Defendants apply § 1373 against Plaintiff Cities to designate them as "sanctuary jurisdictions," i.e., as entities that violate § 1373, that application of § 1373 would be unconstitutional.

111.    As applied to Plaintiff Cities, § 1373 would be unconstitutional because it would intrude upon local governments' exercise of powers conferred upon them by the state, and would

unlawfully restrict their ability to shape local governance according to the needs and policy mandates of their electorates.

**A.   The Tenth Amendment Prohibits Federal Commandeering of State and Local Governments**

112.    Amendment Article 89 of the Massachusetts Constitution "reaffirm[s] the customary and traditional liberties of the people with respect to the conduct of their local government," and "grant[s] and confirm[s] to the people of every city and town the right of self-government in local matters."  Mass. Const. amend. art. LXXXIX.  Specifically, under Article 89, cities and towns in the Commonwealth of Massachusetts "may, by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it."  *Id.*  Pursuant to Article 89 and Massachusetts General Law Chapter 43B, the "general court" of Massachusetts (i.e., the Massachusetts state legislature) has conferred upon Massachusetts cities and towns the Commonwealth's sovereign legislative powers, reserving to the state legislature only limited enumerated powers (such as the power to regulate elections, levy and assess taxes, and define crimes), and the power to impose uniform state laws that apply generally across cities and towns.

113.    Under the Tenth Amendment, the federal government cannot compel or coerce Plaintiff Cities to repeal, alter, or not enforce the policies that they have adopted with regard to local law enforcement practices as set forth above.  Nor can the federal government compel Plaintiff Cities to collect immigration-related information so as to enable City government personnel to share information regarding the immigration status of individuals with federal agencies.

114.    If § 1373 is applied to prohibit Plaintiff Cities from adopting local law enforcement policies such as those described above, it is unconstitutional because Congress may

not "directly compel[]" states, or local governments exercising the sovereign powers of a state, to "enact and enforce a federal regulatory program" or to "enact a legislative program." *New York v. U.S.*, 505 U.S. 144, 161-62 (1992).

115.   Section 1373 cannot lawfully be applied to prohibit Plaintiff Cities from adopting local law enforcement policies such as those described above.  To require Plaintiff Cities to collect, consider, and/or permit federal access to immigration-related information concerning their residents would deny Plaintiffs any "'policymaking' discretion" regarding the treatment of immigration-related information, and would amount to a severe "intrusion upon state sovereignty." *Printz v. U.S.*, 521 U.S. 898, 928 (1997).

116.   Through their local law enforcement policies, Plaintiff Cities have sought to distinguish local law enforcement personnel from federal immigration enforcement personnel in order to encourage public confidence in local law enforcement and local government accountability to all City residents.

117.   As applied against these local governance efforts, § 1373 would violate a core principle underlying the Tenth Amendment, namely, the accountability of state and federal government officials to their electorates.

118.   The Tenth Amendment prohibits the federal government from commandeering state officials to execute federal policy, in order to ensure that "state governments remain responsive to the local electorate's preferences" and "state officials remain accountable to the people." *New York*, 505 U.S. at 168.

119.   The application of § 1373 against Plaintiff Cities would place Plaintiff Cities "in the position of taking the blame for [the] burdensomeness and … defects" of a federal program,

thus blurring the lines of accountability that the Tenth Amendment is intended to preserve. *Printz*, 521 U.S. at 929-30.

120.    The federal government also cannot force Plaintiff Cities to share access to, or use of, City law enforcement "facilities, records/databases, booking lists," or access to individuals in the Cities' custody, without "a criminal warrant signed by a judge and based on probable cause." Lawrence Trust Ordinance 9.020.040.

121.    The Tenth Amendment protects states, and entities exercising the powers reserved to the states, from such commandeering of state and local resources and personnel: the federal government cannot "force[] participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918; *see also City of New York v. U.S.*, 179 F.3d 29, 34-35 (2d Cir. 1999) (the federal government may not "shift to the states enforcement and administrative responsibilities allocated to the federal government by the Constitution," nor may it "affirmatively conscript[] states, localities, or their employees in the federal government's service"); *Galarza v. Szalczyk*, 745 F.3d 634, 644 (3d Cir. 2014) ("[I]mmigration officials may not compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme.").

122.    For the same reasons, the federal government cannot compel state and local government entities to detain or continue the detention of any individual solely on the basis of immigration status, and absent a warrant or probable cause. *See Morales v. Chadbourne*, 793 F.3d 208, 214-220 (1st Cir. 2015) (holding that local law enforcement officials' decision to hold a person on an ICE detainer without probable case violated the Fourth Amendment).

123.    Federal regulation makes it clear that if a state or local agency grants a federal request to detain an individual for immigration purposes, the costs of such detention accrue to the

state or local government.  *See* 8 C.F.R. § 287.7(e) ("No detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department.").

124.    Courts have held that requiring state and local agencies to grant federal immigration detainer requests is unconstitutional:  "Under the Tenth Amendment, immigration officials may not order state and local officials to imprison suspected aliens subject to removal at the request of the federal government.  Essentially, the federal government cannot command the government agencies of the states to imprison persons of interest to federal officials."  *Galarza*, 745 F.3d at 643; *see also Miranda-Olivares v. Clackamas Cnty.*, No. 3:12-CV-2317, 2014 WL 1414305, at *6 (D. Or. Apr. 11, 2014) ("[A] conclusion that Congress intended detainers as orders for municipalities to enforce a federal regulatory scheme on behalf of INS would raise potential violations of the anti-commandeering principle.")

**B.    The Tenth Amendment Protects the Policy Choices Plaintiff Cities Have Made Regarding the Treatment of an Individual's Immigration Status in Their Cities**

125.    As described above, *supra* ¶¶ 48-68, Chelsea and Lawrence have exercised the sovereign state power conferred upon them by the Commonwealth of Massachusetts to adopt policies and ordinances that they have determined to be in the best interests of their residents and local law enforcement mandates.

126.    Plaintiff Cities have exercised their right of self-governance under state law to prohibit local law enforcement from considering immigration status as a factor in their policing practices.  A central purpose of these policies is to promote public confidence in the Cities' police departments, and to ensure that residents and voters do not misattribute federal immigration policies to the Cities or hold City officials accountable for federal immigration enforcement actions.  *See* Chelsea Police Policy at 5 ("[I]t is imperative that the local community

is informed and educated…as to the specifics of the local law enforcement agencies' actual role

in [the federal immigration Priority Enforcement Program] so as not to jeopardize the trust,

confidence and spirit of cooperation that the police department and the community at large have

formed" (emphasis removed); Lawrence Trust Ordinance, § 9.020.010 ("The purpose of this

LAWRENCE TRUST Policy and Order is to increase public confidence in Lawrence Law

Enforcement by providing guidelines associated with federal immigration enforcement, arrests,

and detentions.").

127.    As described above, the Cities' policies and ordinances prohibit local law

enforcement from considering immigration status as a relevant factor in policing practices.  This

general policy enables the Cities to assure all their residents that factors such as an individual's

race, ethnicity, national origin, or immigration status, which are unrelated to local law

enforcement mandates, "shall have no bearing on an individual's treatment" by local police.

Lawrence Trust Ordinance, § 9.20.010.

128.    Studies have shown that members of immigrant communities are often afraid to

contact local law enforcement, fearing that interaction with local police may lead to deportation

for themselves or their loved ones.  Hing, at 249-50, 303-08.  Open communication and good

relationships with local communities are critical in preventing and investigating crime.  *Id.*

Crime is significantly lower in sanctuary counties compared with non-sanctuary counties.  *See*

Wong.

129.    Absent the promise of sanctuary cities to avoid local entanglement  with federal

immigration investigations and enforcement, undocumented immigrants would likely avoid

interacting with local law enforcement even when they are victims of, or witnesses to, crimes, for

fear of risking deportation as a result of engaging local police.  Dispelling this fear benefits all residents of the community, as it facilitates more effective reporting and prosecution of crime.

130.    For example, the Chelsea Police Policy explains: "The Chelsea Police Department relies upon the cooperation of all persons, documented citizens and residents as well as those without a specific documentation status, to achieve our important goals of protecting life and property, investigating and preventing crime as well as resolving recurring neighborhood issues. Assistance from the many various immigrant populations is especially important when an immigrant, whether documented or not, is the victim or witness to a crime.  It is absolutely essential that these individuals do not feel apprehensive or intimidated in coming forward with the requisite information and general firsthand knowledge to aid in investigating a particular crime. This type of mutual trust and spirit of cooperation is absolutely crucial in preventing and solving crime incidents, as well as maintaining public order, safety and security in the entire community." Chelsea Police Policy at 1-2.

131.    Similarly, the Lawrence Trust Ordinance declares that the purpose of its policy against aiding federal immigration actions is "to increase public confidence in Lawrence Law enforcement," to encourage all residents, regardless of immigration or citizenship status, to report crimes and aid local law enforcement efforts if and when they are witnesses to crimes. Lawrence Trust Ordinance, § 9.20.010.

132.    Without guarantees such as those provided by Plaintiff Cities' policies against entanglement in federal immigration investigations and detentions, undocumented immigrants who are victims of a crime or who witness a crime face a perilous choice: either report the crime and risk deportation, or suffer as a silent victim or witness to crime.  The first option risks being removed from one's life and family in the U.S., in many cases to a country where one could face

life-threatening conditions or even persecution.  The second option enables criminal actors to

prey on a victim with impunity, or may effectively ensure that persistent crime goes unreported

and unpunished in the community.

133.    Without the protection of sanctuary city policies, this Hobson's choice between

risking deportation to a country from which one has escaped, and suffering silently under

dangerous conditions in a City in which one has sought refuge, particularly affects, among

others, victims of domestic violence.  *See* Eagle Tribune Article.  Out of fear of deportation,

these particularly vulnerable populations of undocumented immigrants may avoid seeking the

protection of police and public safety services, and may avoid reporting crimes that they would

otherwise report in a sanctuary city.

134.    Additionally, when witnesses of criminal activity feel that they can come forward

without fearing deportation, it increases the safety of the entire community.

135.    Encouraging residents to come forward with information regarding criminal

activity is especially important in cities such as Chelsea and Lawrence, where more than a third

of the Cities' populations were born outside of the United States.  *See supra* ¶¶ 28, 32.  Assuring

residents that race, ethnicity, nationality, and immigration status—whether known or unknown—

will have no bearing on an individual's treatment by local police is also of great importance in

cities such as Chelsea and Lawrence, where over 60% of residents identify as Hispanic or Latino.

*See supra* ¶¶ 28, 32.

136.    In consideration of their residents' interests and particular needs, Chelsea and

Lawrence have made the policy choice to treat immigration status as an irrelevant factor in the

routine operations of local law enforcement, absent certain exceptions for individuals arrested

for, convicted of, or suspected (based on probable cause) of participating in certain enumerated crimes.

137.    In accordance with Plaintiff Cities' commitment to enforcing the law without regard to characteristics of individual residents that are irrelevant to the Cities' criminal investigation and prosecution mandates, the Cities specifically prohibit local law enforcement from inquiring into an individual's immigration status, collecting or maintaining immigration-related information, or detaining (or extending the detention of) an individual solely on the basis of immigration status.

138.    Plaintiff Cities have determined, as a matter of local governance and law enforcement, that matters of federal immigration are properly left to the federal government, and that participation by local officers in federal immigration programs would be detrimental to the Cities' governance and law enforcement purposes.  That choice is protected by the Tenth Amendment of the U.S. Constitution and cannot be restricted by 8 U.S.C. § 1373 or the President's Executive Order.

139.    The application of 8 U.S.C. § 1373 to prohibit Plaintiff Cities from adopting the local law enforcement policies and ordinances discussed above would be unconstitutional as a violation of the Tenth Amendment.

**C.  Section 1373 is Unconstitutional Under the Tenth Amendment**

140.    On its face, § 1373 restricts the authority of state and local governments to regulate their officers and employees with regard to the treatment of information regarding an individual's immigration status.

141.    Section 1373's restriction on how state and local governments may regulate the treatment of information regarding an individual's immigration status is an unconstitutional federal restriction on state and local policy choices.

142.    States, and local governments exercising powers granted by the states, like Chelsea and Lawrence, have the protected authority under the Tenth Amendment to determine how to regulate internal affairs, including how to guide local law enforcement to effectuate the will of their local electorates.

143.    Section 1373's prohibition against the exercise of policymaking discretion by state and local governments with regard to the treatment of information regarding immigration-status is unconstitutional under the Tenth Amendment as an unlawful federal intrusion on powers reserved to the states.

**D.    The Executive Order's Directive Against Policies and Practices that "Prevent or Hinder the Enforcement of Federal Law" is Unconstitutional Under the Tenth Amendment**

144.    The Executive Order purports to give the Attorney General carte blanche to "take appropriate enforcement action against any entity . . . which has in effect a statute, policy or practice that prevents or hinders the enforcement of Federal law."  Executive Order Sec. 9(a). This blanket authority, asserted in the vague terms used in the Order, is an assault on fundamental principles of federalism undergirding the U.S. Constitution and the Tenth Amendment.

145.    The Tenth Amendment, and the federalist system under which state and federal governments coexist, protect state and local governments from federal intrusion on powers reserved to the states, and prohibit the federal government from forcing state and local governments to implement legislation according to federal directives or "to regulate in a particular field or a particular way." *New York*, 505 U.S. at 161.

146.    The Executive Order purports to grant federal officers and agencies unfettered discretion to determine whether a governmental entity has in effect statutes, policies, or practices that "prevent[] or hinder[] the enforcement of Federal law," and grants the Federal Executive

power to "take appropriate enforcement action" against such entities.  Executive Order Sec. 9(a).

On its face, this provision of the Executive Order is an unconstitutional attempt to force state and

local governments to fall in line with—or regulate under the directive of—the federal

government.

148.    If Plaintiff Cities are subject to penalties under the Executive Order as entities that

have "in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal

law," then the Executive Order as applied to Plaintiffs is unconstitutional for violating the Tenth

Amendment.  *Id.*

## IX.    THE EXECUTIVE ORDER VIOLATES BEDROCK SEPARATION OF POWERS PRINCIPLES

148.  The Executive Order entrusts Executive branch officials with the power to interpret

8 U.S.C. § 1373 in order to determine whether an entity "willfully refuse[s] to comply with the

statutory provision" or what entities have "in effect a statute, policy, or practice that prevents or

hinders the enforcement of Federal law."  *Id.*

149.    On its face, the Executive Order instructs the Attorney General and Secretary of

DHS to deny funds because of § 1373 violations without any regard to whether the applicable

funding programs condition funding on compliance with § 1373.

150.  The Executive Order therefore legislates a remedy for executively determined

violations of § 1373 by creating a penalty that Congress did not authorize.  Specifically, the

Executive Order compels the withholding of federal funds without regard to whether compliance

with § 1373 is a permissible condition on grant money allocated by Congress.

151.  The Executive Order effectively imposes new conditions on federal grants that

Congress did not establish.  Congress, not the Executive, is granted the power of the purse under

Article I of the U.S. Constitution.  The attempt in the Executive Order to place conditions on

federal grants that Congress did not authorize exceeds the boundaries of executive power set by the U.S. Constitution.

152.  The Executive Order therefore violates the constitutional separation of powers because it imposes conditions on existing federal grant programs without either statutory or constitutional authority.

## X.       THE EXECUTIVE ORDER IS UNCONSTITUTIONALLY VAGUE

153.  The Executive Order provides four potential definitions of  "sanctuary jurisdictions."  It is unclear what statutes, policies, or practices "prevent[] or hinder[] the enforcement of Federal law," what "willfully refus[ing] to comply with 8 U.S.C [§] 1373" entails, or what delineates the scope of "willfully violat[ing] Federal law."  Executive Order Sec. 1, Sec. 9(a).  Some of the definitions of "sanctuary jurisdiction" use the word "willful," suggesting a specific intent to violate the law is necessary to be a "sanctuary jurisdiction."  Other definitions, like those referencing a statute, policy or practice "that prevents or hinders the enforcement of Federal law" suggest more of a negligence standard.  *Id*. Sec. 9(a).  Plaintiff Cities have no reliable way to determine which definition of "sanctuary jurisdiction" applies and whether they fit into the operative definitions.

154.  Because the significant financial penalties at stake in the Executive Order are conditioned on whether Plaintiff Cities are deemed "sanctuary jurisdictions," the Executive Order is also vague about whether Plaintiff Cities are subject to its penalties.

155.  The Executive Order is also vague as to the sanctions for "sanctuary jurisdictions." On its face, the Executive Order threatens receipt of *all* federal grants or *all* federal funds, whether or not they are connected with immigration policies, except as "deemed necessary for law enforcement purposes by the Attorney General or the Secretary."  *Id*. Sec. 9(a).  The

Executive Order provides no guidance on what grants are "necessary for law enforcement purposes."

156.  The vagueness of the Executive Order imposes a chilling effect on all cities, as it is impossible to determine if Plaintiff Cities and others are subject to its terms, or what the potential consequences may be if they are subject to its terms.

157.  The Executive Order's proscriptions and sanctions are unconstitutionally vague in their applications, in violation of the Due Process Clause of the Fifth Amendment of the U.S. Constitution.  The Executive Order does not provide meaningful guidance as to what municipalities must do to continue to receive funding, and it encourages arbitrary enforcement of penalties by the Executive branch.

## CAUSES OF ACTION

### COUNT ONE
### DECLARATORY RELIEF – THE CITY OF CHELSEA COMPLIES WITH
### 8 U.S.C. § 1373

158.  Plaintiff City of Chelsea repeats and incorporates by reference each allegation of the prior paragraphs, as fully set forth herein.

159.  Chelsea is a self-proclaimed sanctuary city.

160.  Defendants contend that "sanctuary jurisdictions" do not comply with 8 U.S.C. § 1373.

161.  Chelsea complies with 8 U.S.C. § 1373.  Neither the June 4, 2007 Resolution nor the Chelsea Police Policy prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, federal immigration agencies information regarding citizenship or immigration status, whether lawful or unlawful, of any individual.

162.  An actual controversy presently exists between Chelsea and Defendants about whether Chelsea complies with 8 U.S.C. § 1373.

163.   A judicial determination resolving this controversy is necessary and appropriate at this time.

### COUNT TWO
### DECLARATORY RELIEF – THE CITY OF LAWRENCE COMPLIES WITH 8 U.S.C. § 1373

164.  Plaintiff City of Lawrence repeats and incorporates by reference each allegation of the prior paragraphs, as fully set forth herein.

165.  Lawrence has taken actions that subject it to the title of sanctuary city.

166.  Defendants contend that "sanctuary jurisdictions" do not comply with 8 U.S.C. § 1373.

167.  Lawrence complies with 8 U.S.C. § 1373.   The Lawrence Trust Ordinance does not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, federal immigration agencies information regarding citizenship or immigration status, whether lawful or unlawful, of any individual.

168.  An actual controversy presently exists between Lawrence and Defendants about whether Lawrence complies with 8 U.S.C. § 1373.

169.  A judicial determination resolving this controversy is necessary and appropriate at this time.

### COUNT THREE
### TENTH AMENDMENT - EXECUTIVE ORDER SECTION 9(A)'S ENFORCEMENT DIRECTIVE IS UNCONSTITUIONALLY COERCIVE

170.  Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

171.  The Executive Order is unconstitutionally coercive of Plaintiff Cities, in violation of the Tenth Amendment to the United States Constitution, as the Executive Branch does not have "authority to require the States to regulate." *Nat'l Fed'n of Indep. Bus v. Sebelius*, 132 S. Ct. 2566, 2602 (2012).

172.  The conditions  that the Executive Order Section 9(a) places on federal grants are constitutionally improper because they were not established unambiguously prior to the funds being granted, and did not allow Plaintiff Cities to make knowing, cognizant decisions about whether to accept federal grants. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24-25 (1981).

173.  The amount of federal funds being threatened is unconstitutionally coercive. *Sebelius*, 132 S. Ct. at 2604-05 (finding the threatened loss of 10% of a state's overall budget to be so coercive as to be a "gun to the head").

174.  There is no connection between the conditions imposed in the Executive Order mandating compliance with federal immigration laws, specifically 8 U.S.C. § 1373, and the federal funds being threatened, as is constitutionally required. *South Dakota v. Dole*, 483 U.S. 203, 211 (1987).

175.  As applied to Plaintiff Cities, the retroactive conditions placed on federal grants in the Executive Order, the threatened loss of federal funds, and the lack of nexus between the Executive Order and the federal funds being threatened constitute unconstitutional coercion in violation of the Tenth Amendment of the United States Constitution.

## COUNT FOUR
## TENTH AMENDMENT – THE EXECUTIVE ORDER IS UNCONSTITUTIONAL

176.   Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

177.  On its face, the Executive Order is unconstitutional as a violation of the Tenth Amendment because it purports to grant Executive officers the authority to penalize state and local governments that are deemed to "prevent or hinder" the enforcement of federal law, and thus purports to enable the federal government to force state and local governments to adopt policies and practices that support or align with federal policies, to the subordination of state and local government interests.

**COUNT FIVE**
**TENTH AMENDMENT – 8 U.S.C. § 1373(a)  IS UNCONSTITUTIONAL AS APPLIED TO PLAINTIFF CITIES**

178.  Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

179.  As applied against Plaintiff Cities, 8 U.S.C. § 1373(a) is unconstitutional as a violation of the Tenth Amendment by, *inter alia,* restricting Plaintiffs from exercising powers conferred upon them by the state in the regulation of Plaintiffs' internal affairs and policy-making decisions regarding effective law enforcement priorities and the regulation of local resources.

**COUNT SIX**
**TENTH AMENDMENT - 8 U.S.C. § 1373(a)  IS UNCONSTITUTIONAL**

180.   Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

181.  On its face, 8 U.S.C. § 1373 is unconstitutional as a violation of the Tenth Amendment because it seeks to limit state and local governments' authority to regulate their internal affairs and to exercise their powers of self-government.  Section 1373 is invalid in all its applications because its terms leave no room for an application of the statute that does not restrict

40

state and local governments' policy choices.  The restriction imposed by any possible application

of § 1373 would violate principles of federalism and the Tenth Amendment.

## COUNT SEVEN
## THE EXECUTIVE ORDER VIOLATES THE SEPARATION OF POWERS RECOGNIZED BY THE UNITED STATES CONSTITUTION

182.  Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs

as if fully set forth herein.

183.  The Executive Order violates the separation of powers recognized by the U.S.

Constitution.

184.  The Executive Order creates a penalty for § 1373 violations that Congress did not

authorize.  Moreover, the Executive Order imposes the penalties without any regard to whether

Congress authorized the Secretary or the Attorney General to impose such conditions on funds in

the underlying statute.

## COUNT EIGHT
## FIFTH AMENDMENT – THE EXECUTIVE ORDER IS UNCONSTITUIONALLY VAGUE, IN VIOLATION OF THE DUE PROCESS CLAUSE

185.  Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs

as if fully set forth herein.

186.  The Executive Order is unconstitutionally vague.  It is impossible for Plaintiff

Cities to determine if they fit into its definition(s) of "sanctuary jurisdictions," whether they are

subject to its penalties, or what penalties might be imposed if they are determined to be

"sanctuary jurisdictions."

187.  As applied against Plaintiff Cities, the Executive Order is unconstitutionally vague

within the meaning of the Due Process Clause of the Fifth Amendment because it fails to clarify

what is required of Plaintiff Cities and thus encourages arbitrary enforcement by failing to

describe with sufficient particularity what a city must do in order to satisfy its mandates.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

A.     Declare that Plaintiff Cities are not "sanctuary jurisdictions" as defined by the

Executive Order and thus not subject to its directives;

B.     Declare that Plaintiff Cities comply with 8 U.S.C. § 1373;

C.     Declare that the City of Chelsea currently complies with 8 U.S.C. § 1373, and that

its June 4, 2007 Resolution and Chelsea Police Policy do not violate 8 U.S.C. § 1373;

D.     Declare that the City of Lawrence currently complies with 8 U.S.C. § 1373, and

that the Lawrence Trust Ordinance does not violate 8 U.S.C. § 1373;

E.     Enjoin Defendants from enforcing 8 U.S.C. § 1373(a) or using it as a condition

for receiving federal funds;

F.     Declare that 8 U.S.C. § 1373(a) is invalid as applied to Plaintiff Cities and their

sanctuary-city laws and policies, which were enacted for legitimate local purposes related to

public health and safety;

G.     Declare that 8 U.S.C. § 1373(a) is unconstitutional on its face;

H.     Declare that the Executive Order's directive that "the Attorney General shall take

appropriate enforcement action against any entity that violates 8 U.S.C. [§] 1373, or which has in

effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law," is

unconstitutional on its face;

I.     Declare that the Executive Order's directive that "the Attorney General shall take

appropriate enforcement action against any entity that violates 8 U.S.C. [§] 1373, or which has in

effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law," is unconstitutional as applied to Plaintiffs;

J.      Enjoin Defendants from designating Plaintiff Cities as jurisdictions that fail to comply with 8 U.S.C. § 1373;

K.      Enjoin unconstitutional applications of the enforcement directive in Executive Order Sec. 2(c);

L.      Enjoin unconstitutional applications of the enforcement directive in Executive Order Section 9(a);

M.      In the alternative, enjoin Defendants to provide further clarity on the vague definitions of "sanctuary jurisdictions," which municipalities are subject to its penalties, and what those penalties might be;

N.      Award Plaintiffs reasonable costs and attorneys' fees; and

O.      Grant any other further relief that the Court deems fit and proper.


Dated: February 8, 2017

                                        Respectfully submitted,

                                         /s/ Inez H. Friedman-Boyce

                                        Inez H. Friedman-Boyce (BBO# 630910)
                                        IFriedmanBoyce@goodwinlaw.com
                                        Daryl Wiesen (BBO# 634872)
                                        DWiesen@goodwinlaw.com
                                        Elaine Herrmann Blais (BBO # 656142)
                                        EBlais@goodwinlaw.com
                                        Jennifer Burns Luz (BBO # 657739)
                                        JLuz@goodwinlaw.com
                                        Sarah J. Fischer (BBO # 688878)
                                        SFischer@goodwinlaw.com
                                        Alexandra Lu (BBO # 691114)
                                        ALu@goodwinlaw.com

Louis Lobel (BBO # 693292)
LLobel@goodwinlaw.com

Goodwin Procter LLP
100 Northern Ave.
Boston, MA 02210
(617) 570-1000

Elizabeth Holland (*pro hac vice pending*)
EHolland@goodwinlaw.com

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 813-8800

Brian Burgess (*pro hac vice pending*)
BBurgess@goodwinlaw.com

Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, DC 20001-4432
(202) 346-4000

David Zimmer (*pro hac vice pending*)
DZimmer@goodwinlaw.com

Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111-4017
(415) 733-6000

Iván Espinoza-Madrigal (*pro hac vice pending*)
iespinoza@lawyerscom.org
Oren Sellstrom  (BBO # 569045)
osellstrom@lawyerscom.org
Sophia Hall (BBO # 684541)
SHall@lawyerscom.org

Lawyers' Committee for Civil Rights and Economic
Justice

61 Batterymarch St., 5th Floor
Boston, MA 02110
(617) 482-1145

*Attorneys for Plaintiffs City of Chelsea and City of Lawrence*